UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SIGNIFY NORTH AMERICA
CORPORATION and SIGNIFY
HOLDING B.V.,

Plaintiffs,

– against –

REGGIANI LIGHTING USA, INC. and
REGGIANI S.P.A. ILLUMINAZIONE,

Defendants.

**OPINION & ORDER**

18 Civ. 11098 (ER)

RAMOS, D.J.:

Signify North America Corporation and Signify Holding B.V. (collectively,
"Signify") bring this case against Reggiani Lighting USA, Inc. and Reggiani S.p.A.
Illuminazione (collectively, "Reggiani"), alleging infringement of five LED-related
patents, including U.S. Patent Nos. 7,348,604 (the "'604 patent"), 7,352,138 (the "'138
patent"), 7,766,518 (the "'518 patent"), 8,070,328 (the "'328 patent"), and 7,262,559 (the
"'559 patent") (collectively, the "patents-in-suit"). Doc. 21. In response, Reggiani brings
four counterclaims and asserts ten affirmative defenses. Doc. 38. Before the Court is
Signify's motion to dismiss Reggiani's third and fourth counterclaims for patent misuse
and inequitable conduct, respectively, and to strike its fifth and tenth affirmative defenses
on the same grounds. Doc. 40. For the reasons stated below, the motion is GRANTED.

I.    **BACKGROUND**

      **A.  Factual Background**

Signify, formerly Philips Lighting, owns numerous lightbulb-related patents,
including for LED inventions and technologies, such as the patents-in-suit. Doc. 21 ¶ 12.
Signify produces both lighting components and fixtures. Doc. 38 ¶ 33. [1]  Although it
competes directly with companies like Reggiani—a "small family owned company . . .

---

[1] All paragraph numbers found in Document 38 refer to the counterclaims, which begin on page 29.

focused on providing innovative luminaires"—it also supplies components to Reggiani and other lighting fixture manufacturers. *Id.* ¶ 8, 33.

In its complaint, Signify alleges that Reggiani infringed the patents-in-suit. Doc. 21 ¶¶ 18–115. In pertinent part, Reggiani counters that at least some of these patents are unenforceable because Signify has engaged in inequitable conduct and patent misuse— allegations that Signify calls unacceptably broad and lacking sufficient factual bases to survive a motion to dismiss.

*1. Inequitable Conduct Allegations*

According to Reggiani, one or more individuals at Signify impermissibly withheld references from the '138 and '559 patent applications with the specific intent to deceive the United States Patent Office (the "PTO"), thereby rendering these patents unenforceable. Doc. 38 ¶¶ 45, 51. These patents appear to describe a type of light dimmer and a type of light switch, respectively. The '138 patent is titled "Methods and apparatus for providing power to lighting devices," and describes, in part, a method and device for controlling LED-based light sources (*e.g.*, via a dimmer). Doc. 21 ¶¶ 14, 36. The '559 patent is titled "LEDs Driver," and describes, in part, a control switch-operable power supply for LED light sources (*e.g.*, a light switch). *Id.* ¶¶ 17, 99.

With respect to the '138 patent, Reggiani alleges that at least one individual at Signify—either Ihor A. Lys, Frederick M. Morgan, and/or Joseph Teja—knowingly withheld a material publication from the PTO during the prosecution of that patent. Doc. 38 ¶ 45. Lys and Morgan were inventors of the '138 patent, and Teja was prosecution counsel for the patent. *Id.* The allegedly material publication was PCT International Publication No. WO 99/31560 (the "'138 publication"). The publication, titled "Digitally Controlled Illumination Methods and Systems," is an international patent application filed in December 1998 and published in June 1999. It describes "methods and systems for illumination," including "LED systems associated with a processor." Doc. 41, Ex. B at 1. According to Reggiani, the '138 publication is prior art to the patent because it

discloses or renders either anticipated or obvious certain limitations to its first claim. Doc. 38 ¶¶ 45–47. Reggiani states that the PTO specifically noted that at least one of these limitations was absent from the prior art, and, therefore, that if the PTO had been aware of the '138 publication, it would not have issued at least the first claim of the patent. *Id.* ¶ 47. Reggiani further alleges that the '138 publication is non-cumulative of other references because any similar reference was "buried in over 400 other [cited] references, were published after the filing date of the '138 patent, were not . . . prior art'" and would have thus been "easily overlooked." *Id.* ¶ 48. Lys and Morgan allegedly knew about the publication and its materiality because they were listed as inventors on the publication. *Id.* ¶ 49. Similarly, Teja was allegedly aware of it because he disclosed the publication in unrelated patent applications he prosecuted. *Id.* At least one of these individuals allegedly withheld the publication from the PTO in furtherance of a strategy "to broadly cover the LED retrofit[2] market and to broaden and lengthen the patent coverage of . . . technology relating to LED lighting." *Id.* ¶ 50.

Reggiani makes similar allegations concerning the '559 patent. Specifically, it alleges that Signify's strategy to "cover the LED retrofit market" led at least two of the named inventors on the '559 patent, Ajay Tripathi and Bernd Clauberg, and/or its prosecution counsel, including Robert J. Krause, to knowingly withhold U.S. Patent Application Publication No. US 2002/0176262 (the "'559 publication") during the prosecution of that patent. *Id.* ¶¶ 51, 54. The '559 publication is a patent application titled "Power Supply for LEDs," published in November 2002. Doc. 41, Ex. C. It describes, at least in part, a method for "adjust[ing] the current flow through the transformer supplying current to . . . LEDs." *Id.* at 1. Reggiani claims that the '559 publication was material to the patent application because it disclosed each limitation of the patent's eleventh claim and thereby rendered it either anticipated or obvious. Doc. 38

---

[2] Retrofitting refers to replacing traditional light bulbs with LED bulbs.

¶¶ 51–53.  During the examination, "Applicants argued, and the Examiner agreed" that these limitations were missing from the prior art, *id.* ¶ 53, a claim that disclosure of the '559 publication would have rebutted.  Therefore, had the PTO known of the '559 publication, it would not have issued at least the patent's eleventh claim.  *Id.*  Tripathi and Clauberg allegedly knew of the publication and its materiality because they were listed as the publication's inventors and because the publication shared portions of its disclosure statement with the '559 patent.[3]  *Id.* ¶ 54.  Allegedly, this was not the only material reference withheld by in-house counsel during the prosecution of the '559 patent; according to Reggiani, withholding the '559 publication was part of a larger "pattern of lack of candor."  *Id.*

Signify argues that these allegations fail to "point to any deliberate decision by any specific individual to withhold the allegedly material information during the prosecution of the '138 and '559 patents."  Doc. 41 at 1.  In particular, it maintains that Reggiani's continued use of the "and/or" conjunction dooms the allegations, as it forecloses the specificity required for pleading fraud-based claims under Rule 9(b).

### 2. Patent Misuse

Reggiani also alleges that "Signify filed this lawsuit knowing that the asserted patents are likely invalid and/or that Reggiani's products could not possibly infringe them, and thus filed it in bad faith and with the improper purpose of stifling competition in the market."  Doc. 38 ¶ 40.  This is part of Signify's alleged larger pattern of targeting lighting fixture manufacturers, which are mostly small companies, and threatening litigation that they most likely cannot afford.  *Id.* ¶ 36.  For example, Reggiani notes that "numerous" suits against other lighting fixture manufactures "have settled at the early stages of litigation."  *Id.* ¶ 35.  And, according to Reggiani, Signify's over 900 licensees

---

[3] The Patent Act requires "a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ."  35 U.S.C. § 112(a).

"were acquired mainly through cease and desist letters threatening litigation." *Id.* ¶ 38. The purpose of this scheme is to use Signify's extensive lighting patent portfolio to coerce the licensing of patents for exorbitant fees, regardless of whether the patents are valid or actually infringed. *Id.* ¶¶ 34, 37. Among the patents Signify lists on its website, Reggiani estimates that about one-fifth are expired and notes that the foreign counterparts for others, including the '138, '559, and '604 patents, have been revoked, withdrawn, or limited. *Id.* ¶ 39.

Not only does Signify contest that its alleged "bad faith" enforcement can form a legal basis for patent misuse, but also that, even if this theory were to survive, Reggiani's pleadings fail to establish how the current action impermissibly broadens the scope of any of the patents-in-suit with anticompetitive effects, as required for pleading patent misuse. *See* Doc. 41.

### B. Procedural History

Signify brought this action on November 28, 2018, Doc. 1, and amended its complaint on February 5, 2019, Doc. 21, claiming five counts of patent infringement against Reggiani. Reggiani filed an answer and counterclaims on March 22, 219, Doc. 25, which Signify answered on April 12, 2019, Doc. 28. Reggiani then amended its answer twice, once on April 17, 2019, Doc. 30, and again on May 23, 2019, Doc. 38. It asserts ten affirmative defenses and brings counterclaims for invalidity, noninfringement, patent misuse, and inequitable conduct. Doc. 38.

On June 24, 2019, Signify filed the instant motion seeking to dismiss Reggiani's counterclaims for patent misuse and inequitable conduct pursuant to Federal Rule of Civil Procedure 12(b)(6) and to strike affirmative defenses for the same pursuant to Rule 12(f). Doc. 40.

## II.     LEGAL STANDARD

### A.  Rule 12(b)(6)

*1.  General Pleading Standard*

 "A motion to dismiss a counterclaim is evaluated under the same standard as a motion to dismiss a complaint." *Inter-Am. Dev. Bank v. IIG Trade Opportunities Fund N.V.*, No. 16 Civ. 9782 (PAE), 2017 WL 6025350, at *4 (S.D.N.Y. Dec. 4, 2017) (internal quotation marks and citations omitted).  Under Federal Rule of Civil Procedure 12(b)(6), a complaint may be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v. Nath*, 893 F. Supp. 2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)).  "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it."  *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal quotation marks and citations omitted).

Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *Koch v. Christie's Int'l, PLC*, 699 F.3d 141, 145 (2d Cir. 2012); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007) ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable . . . .").  However, the Court is not required to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* at 678 (quoting *Twombly*, 550 U.S. at

570).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citing *Twombly*, 550 U.S. at 556).  If the plaintiff has not "nudged [his] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

2.  *Heightened Pleading Standard for Allegations of Fraud*

Beyond the requirements of Rule 12(b)(6), a complaint alleging fraud must satisfy the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) by stating the circumstances constituting fraud with particularity.  *See, e.g.*, *ECA & Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319–20 (2007)). Specifically, Rule 9(b) requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *DiMuro v. Clinique Labs., LLC*, 572 F. App'x 27, 30 (2d Cir. 2014) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).  Put another way, Rule 9(b) "requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."  *See U.S. ex rel. Kester v. Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 252 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).

**B.  Rule 12(f)**

Federal Rule of Civil Procedure 12(f) provides that a court may strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter."  Fed. R. Civ. P. 12(f).  "[A]ffirmative defenses alleging fraud must be pled with particularity as required by Rule 9(b), or be struck as inadequately pled."  *Sesto v. Slaine*, 171 F. Supp. 3d 194, 205 (S.D.N.Y. 2016) (citing *Erickson Beamon Ltd. v. CMG Worldwide, Inc.*, No. 12 Civ. 5105 (NRB), 2014 WL 3950897, at *5 (S.D.N.Y. Aug. 13, 2014)).

In deciding motions to dismiss affirmative defenses, courts in this Circuit have traditionally required the moving party to show that "(1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by inclusion of the defense." *S.E.C. v. McCaskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999). The Second Circuit has recently clarified that "the plausibility standard of *Twombly*" applies to the first factor, "with recognition that . . . applying the plausibility standard to any pleading is a context-specific task." *GEOMC Co., Ltd. v. Calmare Therapeutics Inc.*, 918 F.3d 92, 98 (2d Cir. 2019) (internal quotation marks and citation omitted) (noting that, although the plausibility standard applies, courts should be mindful of the limited timeframe afforded to those who plead an affirmative defense under the Federal Rules). Analysis of the second factor remained unchanged. *Id.* ("There is no dispute that an affirmative defense is improper and should be stricken if it is a legally insufficient basis for precluding a plaintiff from prevailing on its claims."). With respect to the third factor, the court clarified that "[a] factually sufficient and legally valid defense should always be allowed if timely filed even if it will prejudice the plaintiff by expanding the scope of the litigation." *Id*. Of course, "prejudice may be considered and, in some cases, may be determinative, where a defense is presented beyond the normal time limits of the Rules, especially at a late stage in the litigation, and challenged by a motion to dismiss or opposed by opposition to a Rule 15(a) motion." *Id.* (citation omitted).

## III.  DISCUSSION

Signify challenges Reggiani's counterclaims for inequitable conduct and patent misuse, as well as its affirmative defenses for the same. The Court considers each of these in turn.

### A.  Inequitable Conduct Counterclaim

"[I]n pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material

misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1327 (Fed. Cir. 2009). "A pleading that simply avers the substantive elements of inequitable conduct, without setting forth the particularized factual bases for the allegation, does not satisfy Rule 9(b)." *Id.* at 1326–27. The pleadings "must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information . . . and (2) withheld or misrepresented this information with a specific intent to deceive the PTO." *Id.* at 1328–29. An inference is reasonable when it is "plausible and . . . flows logically from the facts alleged, including any objective indications of candor and good faith." *Id.* at 1329 n.5 (citation omitted). "The mere fact that an applicant disclosed a reference during prosecution of one application, but did not disclose it during prosecution of a related application, is insufficient to meet the threshold level of deceptive intent required to support an allegation of inequitable conduct." *Id.* at 1331. Moreover, "[a]ctivities that seem 'inconsistent with knowledge of illegality or fear of a lawsuit' do not support an inference of fraudulent intent, even at this preliminary stage." *Ferring B.V. v. Serenity Pharm., LLC*, 391 F. Supp. 3d 265, 276 (S.D.N.Y. 2019) (quoting *Exergen*, 575 F.3d at 1329 n.5).

Signify argues that Reggiani has failed to meet the requirements of Rule 9(b) because it has not established the "what," "how," and "who" of the alleged offense with sufficient specificity for either the '138 or the '559 patent. The Court agrees.

*1. The '138 Patent*

As an initial matter, the Court considers whether Reggiani has successfully alleged that the withheld '138 publication was material to the '138 patent application. Information is material in a patent application when either:

> (a) "there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent[]"; or (b) it falls within the standards set forth in PTO Rule 56, which provides in pertinent part that "[i]nformation is material to patentability when it is not cumulative to

> information already of record or being made of record in the appli-
> cation, and . . . [i]t refutes, or is inconsistent with, a position the
> applicant takes in:  (i) [o]pposing an argument of unpatentability re-
> lied on by the [PTO], or (ii) [a]sserting an argument of patentabil-
> ity."

*Nycomed U.S. Inc. v. Glenmark Generics Ltd.*, No. 08 Civ. 5023 (RLM), 2010 WL 1257803, at *14 (E.D.N.Y. Mar. 26, 2010) (quoting *Cargill, Inc. v. Canbra Foods, Ltd.*, 476 F.3d 1359, 1364 (Fed. Cir. 2007)).  "[T]he materiality required to establish inequita- ble conduct is but-for materiality."  *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1291 (Fed. Cir. 2011).  The pleadings must identify "which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found."  *Exergen*, 575 F.3d at 1329.  It must also establish which "particular claim limitations, or combination of claim limitations . . . are supposedly absent from the information of record."  *Id.*  "Such allegations are necessary to explain both 'why' the withheld information is material and not cumulative, and 'how' an examiner would have used this information in assessing the patentability of the claims."  *Id.* at 1329–1330.

Reggiani's allegations meet these criteria.  Reggiani has successfully identified which claim—Claim 1—and which limitation—the configuration of the controller—the reference would be relevant to.  Doc. 38 ¶ 47.  It has also adequately pled where this in- formation may be found.  *Id.* (citing the '138 publication at 30–34 and Figs. 6–14).[4] Whether or not the publication does, indeed, do what Reggiani alleges is a merits ques- tion ordinarily resolved at a later time.

---

[4] The Court agrees with Signify that Reggiani's citation only to the publication misleadingly suggests that it contains the same text as the '138 patent when it does not.  However, this alone does not necessarily mean that Reggiani has not met its pleading burden.

However, Reggiani has not established that this information is non-cumulative. Reggiani admits that "issued patents from the same family were disclosed," but alleges that "these were buried in over 400 other references cited." *Id.* ¶ 48. Under Federal Circuit law, "[a]n applicant [cannot] be guilty of inequitable conduct if the reference was cited to the examiner." *Fiskars, Inc. v. Hunt Mfg. Co.*, 221 F.3d 1318, 1327 (Fed. Cir. 2000); *see also Radiancy, Inc. v. Viatek Consumer Prods. Grp. Inc.*, 138 F. Supp. 3d 303, 317–18 (S.D.N.Y. 2014) ("[C]ourts have generally rejected the claim that a reference, if submitted to the PTO Examiner, can be buried for the purposes of establishing inequitable conduct." (citing *Fiskars*, 221 F.3d at 1327)); *Symbol Techs., Inc. v. Aruba Networks, Inc.*, 609 F. Supp. 2d 353, 358–59 (D. Del. 2009) (explaining that contrary Federal Circuit precedent, *Molins PLC v. Textron, Inc.*, 48 F.3d 1172 (Fed. Cir. 1995), was based on regulations that are no longer in effect). Because Reggiani makes no attempt to distinguish the '138 publication from the disclosed publications and because these cannot be the basis of an inequitable conduct claim, the Court finds that Reggiani has failed to sufficiently allege that the reference is non-cumulative.

Moreover, Reggiani has failed to allege that any one individual both (1) knew that the '138 publication was material and (2) withheld it from the PTO with the intent to deceive. In other words, Reggiani has failed to plead "who" committed the inequitable conduct with the specificity required by Rule 9(b).

Reggiani alleges that:

During prosecution of the application that led to the '138 patent, persons associated with the filing and prosecution of that patent application, including named inventors Ihor A. Lys . . . Frederick M. Morgan . . . and/or prosecution counsel, including Joseph Teja . . . withheld from the United States Patent Office at least [the '138 publication].

Doc. 38 ¶ 45. Reggiani goes on to allege that these three individuals—Lys, Morgan, and Teja—knew of the withheld material information because Lys and Morgan were also named inventors on the '138 publication, the '138 publication was cited during the prosecution of other patent applications for which Lys and Morgan applied as inventors and which were prosecuted by Teja, and because the publication "was also specifically referred to and incorporated by reference into the disclosure of a . . . U.S. patent on which Mr. Lys is the sole named inventor and for which Mr. Teja was also the prosecuting attorney." *Id.* ¶ 49. It alleges that Lys, Morgan, "and/or" Teja withheld the information with specific intent to deceive. *Id.* ¶ 50. To support this allegation, it states that "Lys, Morgan and/or Teja were involved in devising a patent strategy to broadly cover the LED retrofit market and to broaden and lengthen the patent coverage of [Signify's predecessor's] original technology relating to LED lighting." *Id.*

Arguably, Reggiani has sufficiently pled a factual basis from which to infer that Lys and Morgan, both inventors listed on the '138 publication, knew of the withheld reference's materiality, *see, e.g.*, *Int'l Test Sols., Inc., v. Mipox Int'l Corp.*, No. 16 Civ. 791 (RS), 2017 WL 2118314, at *6 (N.D. Cal. May 16, 2017) ("Courts recognize . . . [that] a patent inventor can be assumed to have knowledge of the patent's contents."),[5] but the same cannot be said of Teja, *see, e.g.*, *Brasseler, U.S.A. I, L.P. v. Stryker Sales Corp.*, 267 F.3d 1370, 1383 (Fed. Cir. 2001) ("[N]o duty to inquire arises unless counsel is on notice of the likelihood that specific, relevant, material information exists and should be disclosed."). "A reference may be many pages long, and its various teachings may be

---

[5] The Court takes no position on whether this is, indeed, the inference it would ultimately draw from the allegations, but rather considers these in the light most favorable to Reggiani.

relevant to different applications for different reasons. Thus, one cannot assume that an individual, who generally knew that a reference existed, also knew of the specific material *information* contained in that reference." *Exergen*, 575 F.3d at 1330. Though Reggiani alleges that Teja referred to the '138 publication during the prosecution of other patents, there are no allegations that the publication was cited for the relevant propositions, or that Teja would have reason to know of or inquire about the publication's materiality to the '138 patent.

Without this link, Reggiani's claim lacks the specificity that Rule 9(b) demands. Indeed, Reggiani's use of the term "and/or" makes it entirely possible that Lys and Morgan—the only two individuals who, according to Reggiani's pleadings, might plausibly have the requisite knowledge of materiality—might not be the individuals who acted with intent to deceive. *See Drew Techs., Inc. v. Robert Bosch, L.L.C.*, No. 12 Civ. 15622 (TGB), 2014 WL 562458, at *3 (E.D. Mich. Feb. 13, 2014) ("By alleging that 'Michael Drew, Brian Herron *and/or* their representatives' (emphasis added) committed a particular act, Bosch has not alleged that any *one* of those individuals necessarily committed the particular act, nor has Bosch clearly pleaded any joint concert of action. Indeed, it appears from the pleading in the alternative that Bosch is uncertain who actually committed the act."); *Senju Pharm. Co., Ltd. v. Apotex, Inc.*, 921 F. Supp. 2d 297, 307 (D. Del. 2013) *(*"[T]here are no facts from which the court can reasonably infer that any individual with knowledge [of the misrepresentation] also had knowledge of the falsity of any material misrepresentation and that the same individual misrepresented the information with a specific intent to deceive the PTO.").

Reggiani has therefore failed to state with specificity an individual (or individuals) "who both knew of the material information and deliberately withheld or misrepresented it." *Exergen*, 575 F.3d at 1329.

### 2. The '559 Patent

Reggiani's allegations regarding the '559 patent suffer from similar infirmities. Though Reggiani points to relevant claims and limitations, as well as indicates where in the reference those claims might be found, Doc. 38 ¶ 53, it fails to adequately identify who committed the alleged offence. It posits that Tripathi, Clauberg, "and/or" Kraus knew about the publication because Tripathi and Clauberg were also its inventors. *Id.* ¶ 54. Even if the inventors could be assumed to know about the materiality of the publication, as Reggiani argues in its brief, there are absolutely no details as to how Kraus would know about the publication or about its materiality. Moreover, many of Reggiani's allegations refer to Signify writ large, rather than to a specific individual, as required by Rule 9(b). For example, Reggiani alleges that "*Signify* . . . was also devising a patent strategy to cover the LED retrofit market,"[6] and that "at least *Signify*'s in-house counsel responsible for prosecuting the application that led to the '559 patent also intentionally withheld additional material references from the United States Patent Office during the prosecution of the application that issued the '559 patent." *Id.* (emphasis added). The "pattern of lack of candor," Reggiani refers to is also attributed to Signify writ large. *Id.* Reggiani's references to Signify are insufficient to meet the standard for stating an inequitable conduct claim. *See, e.g.*, *Senju Pharm. Co.*, 921 F. Supp. 2d at 307 ("As in *Exergen*, Apotex's inclusion of general entities, Senju Pharma and Kyorin, in the pleadings does not permit the court to reasonably infer that any specific individual was responsible." (citing *Exergen*, 575 F.3d at 1329–30)).

---

[6] Reggiani fails to define this market.

The Court therefore finds that Reggiani has failed to properly plead inequitable conduct with respect to either patent.

### B. Patent Misuse Counterclaim

Patent misuse is "a judicially created defense." *Princo Corp. v. Int'l Trade Comm'n*, 616 F.3d 1318, 1329 (Fed. Cir. 2010). The "basic rule" is that "the patentee may exploit his patent but may not use it to acquire a monopoly not embraced in the patent." *Id.* at 1327 (internal quotation marks and citation omitted). Asserting patent misuse "requires that the alleged infringer show that the patentee has impermissibly broadened the 'physical or temporal scope' of the patent grant with anticompetitive effect." *Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 868 (Fed. Cir. 1997) (internal quotation marks and citations omitted). The purpose of the doctrine is "to prevent a patentee from using the patent to obtain market benefit beyond that which inheres in the statutory patent right." *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1184 (Fed. Cir. 2005) (internal quotation marks and citation omitted). "Because patent misuse is a judge-made doctrine that is in derogation of statutory patent rights against infringement," it is not applied expansively. *Princo Corp.*, 616 F.3d at 1321.

Certain activities have been found to be per se patent misuse, such as "tying" arrangements that require the purchase of an unpatented product or "arrangements in which a patentee effectively extends the term of its patent by requiring post-expiration royalties." *Va. Panel*, 133 F.3d at 869. On the other hand, certain activities are statutorily proscribed from constituting patent misuse, including (1) "licens[ing] or authoriz[ing] another to perform acts which if performed without . . . consent would constitute contributory infringement of the patent," and (2) "[seeking] to enforce . . . patent rights against infringement or contributory infringement." 35 U.S.C. § 271(d)(2)–(3). If an activity falls in neither category, courts consider whether the conduct is "reasonably within the patent grant, *i.e.*, that it relates to subject matter within the scope of the patent claims." *Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 708 (Fed. Cir. 1992),

*abrogated on other grounds by Impression Prods., Inc. v. Lexmark Intern., Inc.*, 137 S. Ct. 1523 (2017). "If the conduct is reasonably within the patent grant, it 'does not have the effect of broadening the scope of the patent claims and thus cannot constitute patent misuse.'" *Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, No. 98 Civ. 7766 (PAC), 2006 WL 3342655 (S.D.N.Y. Nov. 16, 2006) (quoting *Va. Panel Corp.*, 133 F.3d at 869).

To the extent Reggiani's patent misuse claims rely on the inequitable conduct claims, these must also be dismissed. However, Reggiani argues that even if its inequitable conduct claims fail, it has still adequately pled patent misuse by relying on the "bad faith" theory of patent enforcement. Doc. 43 at 22–23. Signify disputes that such a theory is available and, even if it is, that Reggiani has failed to adequately plead it. The Court agrees with Signify.

The main source of Reggiani and Signify's disagreement over whether patent misuse can be pled on a theory of bad faith is the 1995 Federal Circuit case, *Glaverbel Societe Anonyme v. Northlake Marketing & Supply, Inc.*, 45 F.3d 1550 (Fed Cir. 1995). There, the court held that "[t]he bringing of a lawsuit to enforce legal rights does not of itself constitute violation of the antitrust laws or patent misuse; there must be bad faith and improper purpose in bringing the suit, in implementation of an illegal restraint of trade." *Glaverbel*, 45 F.3d at 1558.[7] However, as the Court later unequivocally stated in *C.R. Bard, Inc. v. M3 Systems, Inc.*, "[i]t is not patent misuse to bring suit to enforce patent rights not fraudulently obtained." 157 F.3d 1340, 1373 (Fed. Cir. 1998).

---

[7] Some courts have since interpreted *Glaverbel* to mean that a claim for patent misuse alone, rather than for antitrust violations, can survive if bad faith and improper purpose are properly alleged together with an allegation that the behavior has "impermissibly broadened the scope of the patent grant with anticompetitive effect." *Nalco Co. v. Turner Designs, Inc.*, No. 13 Civ. 2727 (NC), 2014 WL 645365, at *10 (N.D. Cal. Feb. 19, 2014) (quoting *U.S. Philips*, 424 F.3d at 1184); *see also, e.g., ESCO Corp. v. Cashman Equip. Co.*, 158 F. Supp. 3d 1051, 1069–70 (D. Nev. 2016). As explained in more detail below, this approach contravenes not only 35 U.S.C. § 271(d)(3), but also later Federal Circuit case law.

In *C.R. Bard*, Plaintiff was the patent holder for devices used to take samples of body tissue for biopsies. It sued one of its competitors for infringement. In turn, the Defendant argued that Plaintiff's patents were invalid and not infringed and that the Plaintiff had committed fraud, antitrust law violations, and patent misuse. A jury verdict found that Plaintiff had committed, among other offenses, antitrust violations as well as patent misuse. The antitrust violation verdict had been secured in part on a "sham litigation" theory. Plaintiff appealed. On appeal, the Federal Circuit noted that to qualify as "sham litigation," "(1) the lawsuit must be objectively meritless such that no reasonable litigant could expect success on the merits[,] and (2) it must be found that the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor." *Id.* at 1368 (internal quotation marks and citations omitted). "Conduct prohibited under antitrust law includes bringing suit to enforce a patent with knowledge that the patent is invalid or not infringed, and the litigation is conducted for anti-competitive purposes." *Id*. After ultimately finding that the "sham litigation" theory was unsupported by substantial evidence with respect to the alleged antitrust violation, *id.* at 1369, the court went on to consider whether essentially the same conduct could be a basis for finding patent misuse, *id.* at 1372.

The jury instruction at issue essentially superimposed a version of the "sham" litigation standard on patent misuse, counseling that, even in the absence of an antitrust violation,

> A patent is unenforceable for misuse if the patent owner attempts to exclude products from the marketplace which do not infringe the claims of the patent and the patent owner has actual knowledge that those products do not infringe any claim of the patents. The patent is also unenforceable for misuse when a patent owner attempts to use the patent to exclude competitors from their marketplace knowing that the patent was invalid or unenforceable.

*Id.* at 1373; *see also* 4 *Annotated Patent Digest (Matthews)* § 28:20 (2019). The Federal Circuit characterized the jury instruction as "explaining that [an] antitrust violation is not

necessary to find misuse if patents have been used 'wrongfully' to exclude competitors."
*C.R. Bard*, 157 F.3d at 1373. Ultimately, the Federal Circuit rejected the district court's
approach and declined to create "a new class of prohibited commercial conduct when pa-
tents are involved." *Id.* It therefore concluded that "[t]he verdicts of patent misuse
[were] not supported by evidence or correct legal theory." *Id.* Having found that a
"sham" litigation theory was unsupported in the antitrust context, the court noted that the
same activity was "not subject to collateral attack as a new ground of 'misuse.'" *Id.* But
it also went further, making clear that bad faith allegations alone were insufficient to state
a claim for patent misuse. "Although the defense of patent misuse indeed evolved to pro-
tect against 'wrongful' use of patents," it wrote, "the catalog of practices labelled 'patent
misuse' does not include a general notion of 'wrongful' use."[8] *Id.*

As in *C.R. Bard*, the allegations against Signify do not establish that "[its] com-
petitive activities were either per se patent misuse or that they were not 'reasonably
within the patent grant.'" *Id.* (citing *Mallinckrodt*, 976 F.2d at 708). The crux of Reg-
giani's patent misuse allegations are that "Signify is asserting patents it knows to be inva-
lid and/or asserting unfounded grounds for infringement in bad faith in order to stifle
competition in the market, thereby impermissibly broadening the subject matter and tem-
poral scope of patents and patent rights with anticompetitive effect." Doc. 38 ¶ 41.
There are no allegations of tying or licensing conditions that have "the effect of imper-
missibly broadening the patent grant." *Princo Corp.*, 616 F.3d at 1328–29. Nor are there

---

[8] This approach is also in keeping with 35 U.S.C. § 271(d)(3), which specifically creates a safe harbor for actions, like Signify's, "to enforce . . . patent rights against infringement or contributory infringement."

allegations that the current suit does not "relate[] to subject matter within the scope of the patent claims." *Mallinckrodt, Inc.*, 976 F.2d at 708.

The Court notes that this approach differs from that taken in *Optigen, LLC v. Animal Genetics, Inc.*, No. 10 Civ. 940 (FJS) (DEP), 2011 WL 13234631 (N.D.N.Y. May 23, 2011). In that case, the court recognized a separate cause of action for patent misuse based on "bad faith" enforcement. In doing so, it relied in part on the self-styled additional views filed by Judge Nies in *Argus Chemical Corp. v. Fibre Glass-Evercoat Co., Inc.*, 812 F.2d 1381 (Fed. Cir. 1987), wherein he identified three types of patent misconduct, including "misconduct which rises to the level of common law fraud and which will support an antitrust claim." 812 F.2d at 1387. The Court does not dispute that such conduct may give rise to an antitrust violation—which was also successfully pled in *Optigen*—but finds no support in more recent Federal Circuit law for the proposition that "bad faith" enforcement alone gives rise to patent misuse.[9] The Court therefore declines to follow *Optigen*.

For the reasons stated above, the Court finds that Reggiani has not adequately pled patent misuse.[10]

---

[9] The other cases cited by Reggiani are inapposite, as they present classic examples of per se patent misuse. In both *Affymetrix, Inc. v. PE Corp. (NY)*, 219 F. Supp. 2d 390, 397 (S.D.N.Y. 2002) and *Vaughan Co. v. Glob. Bio-Fuels Tech., LLC*, No. 12 Civ. 1292, 2013 WL 5755389, at *11 (N.D.N.Y. Oct. 23, 2013), the plaintiff was attempting to enforce patents beyond their expiration, thereby extending their "temporal scope."

[10] Even if Reggiani's bad faith enforcement theory were available as an avenue for finding patent misuse, Reggiani has not met its pleading burden. The fact that Signify has settled numerous other lawsuits does not suggest that this litigation was undertaken in bad faith, nor are there allegations that those other lawsuits were not meritorious. Reggiani has also failed to properly allege anticompetitive effects with respect to the particular patents at issue. *See Princo*, 616 F.3d at 1329 ("[M]isuse must be of the patent in suit." (internal quotation marks and citations omitted)). Reggiani's counterclaim, then, would fail even under a bad faith enforcement theory.

### C. Affirmative Defenses

Finally, Signify argues that Reggiani's inequitable conduct and patent misuse defenses be struck for largely the same reasons that the corresponding counterclaims should be dismissed. For the reasons stated above, Reggiani's affirmative defense for inequitable conduct, which largely mirrors its counterclaim for the same, does not meet the required *Twombly* pleading standard. As for the patent misuse defense, Reggiani states in a single conclusory sentence that "Signify is barred from any relief in this action, and the patents in suit are unenforceable under the doctrine of unclean hands and/or patent misuse." Doc. 38 at 21. This defense also fails to meet "the plausibility standard of *Twombly*." *GEOMC*, 918 F.3d at 98. Although this standard is relaxed in the context of affirmative defenses, *id.*, in this case, that lenient standard should not apply, as Reggiani apparently had enough time to marshal more facts, sufficient to itself, in support of a mirror counterclaim.

Reggiani urges that discovery may yield additional facts necessary to support this defense. But given the deficiencies in Reggiani's inequitable conduct and "bad faith" allegations and the completely conclusory nature of the asserted defense, the Court sees no reason to allow such a fishing expedition at this time. The Court will therefore strike both the fifth and tenth affirmative defenses.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants without prejudice Signify's motion to dismiss the third and fourth counterclaims and to strike the fifth and tenth affirmative defenses.  Requests for oral argument are denied as moot.  The Clerk of Court is respectfully directed to terminate the motion, Doc. 40.


SO ORDERED.

Dated:    March 23, 2020
          New York, New York

_____
        EDGARDO RAMOS, U.S.D.J.